IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SANDRA BERRIOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No.: 1:11-cv-01130 |
| ) | |
| EXPERIAN INFORMATION SOLUTIONS, ) | |
| INC., et al. ) | |
| Defendants. ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## HER MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Plaintiff, SANDRA BERRIOS ("Ms. Berrios") by counsel, and for

her Memorandum in Support of her Motion for Partial Summary Judgment, she states as follows:

### INTRODUCTION

Since early 2006, Ms. Berrios has resided at her home located in Lorton, Virginia (her

"home") with her two sons. On or about August 8, 2008, Ms. Berrios filed a lawsuit in Fairfax

County Circuit Court against Defendant Flagstar Bank ("Defendant" or "Flagstar") in an action

styled *Sandra J. Berrios v. 1st Principle Mortgage, LLC, et al.*, Civil Action No. CL08-12312.

The case never went to trial because a settlement was reached that resulted in the modification of

her mortgage loan, which was owned and serviced by Flagstar.

Since that time, Ms. Berrios has consistently paid her mortgage to Flagstar in accordance

with the instructions in the modification agreement. Despite her timely payments, Ms. Berrios

began to receive notices from Flagstar that her loan was delinquent. The initial notification was

temporarily resolved when Ms. Berrios's counsel contacted Flagstar's counsel, Anitra Royster.

However, the servicing rights of Ms. Berrios's loan were sold to Nationstar Mortgage

("Nationstar") in October, 2009. Nationstar also erroneously informed Ms. Berrios that she was

1

in default of her mortgage. Once again, Ms. Berrios, through counsel, contacted Flagstar's

counsel, who arranged for Flagstar to reacquire the servicing rights of Ms. Berrios's loan so that

her loan modification would be honored.

After Flagstar reacquired her loan, it began sending Ms. Berrios correspondence that she

was in default of her mortgage even though she made every payment in accordance with the

modification agreement. On September 17, 2010, Ms. Berrios, through counsel, forwarded a

Qualified Written Request to Flagstar, which disputed her delinquency and requested an

investigation of her account. Flagstar did not respond to the Qualified Written Request, and

continued to service Ms. Berrios's loan as if it once in default. On or around May 11, 2011,

Flagstar forwarded Ms. Berrios's loan to foreclosure by instructing Samuel White, P.C. to

conduct a foreclosure sale of her property. Ms. Berrios responded by sending another Qualified

Written Request to Flagstar disputing her delinquency and requesting an investigation on the

status on her loan on or around May 31, 2011. Flagstar did not respond to this Qualified Written

Request.

On or around May 25, 2011, Ms. Berrios obtained copies of her credit reports and learned

that Flagstar was reporting her mortgage account as delinquent. Shortly thereafter, Ms. Berrios

forwarded written disputes to Equifax, Experian and Trans Union. With each dispute, she

included a copy of her loan modification agreement and proof of all her payments pursuant to the

modification agreement. Within one month, all three credit bureaus verified the inaccurate

information that Flagstar placed on Ms. Berrios's credit reports. This item was the only

derogatory item on Ms. Berrios's credit reports.

In the Complaint, the Defendant refused to admit the inaccuracy of its credit reporting,

despite the clear evidence within its possession that Ms. Berrios made every payment in

accordance with the terms of the modification agreement. Despite their denials in the Complaint, the Defendant has conceded in Interrogatory responses that it erred in processing Ms. Berrios' loan modification because it did not fit within their computer program. Because its credit reporting was inaccurate, there is no dispute as to the liability of the Defendant for its violations of the FCRA.

There are no disputed material facts concerning whether Ms. Berrios was or was not delinquent on her modification agreement; therefore, resolution of this issue is a question of law and one best suited for summary judgment. *Alabran v. Capital One Bank,* No. 3:04CV935, 2005 WL 3338663 (E.D. Va. Dec. 8, 2005) (granting summary judgment on the issue of accuracy because there were no disputed facts whether plaintiff was or was not obligated on the subject indebtness). Moreover, Defendant's other possible defense – that it actually complied with the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s-2(b) and attempted to conduct a "reasonable investigation"[1] – is impossible to prove. If the court does not grant summary judgment, the Defendant's continued unwillingness to understand its obligations under the FCRA and accept its exposure will continue to prevent a mediated alternative to trial.

## LOCAL RULE 56 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56(B), Ms. Berrios states that the following material facts are undisputed:

1.      Ms. Berrios resides in Lorton, Virginia with her children. *Declaration of Sandra J. Berrios* (Berrios Decl.), Exhibit "A" ¶ 1.

---

[1] *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) ("The key term at issue here, 'investigation,' is defined as '[a] detailed inquiry or systematic examination.' *Am. Heritage Dictionary* 920 (4th ed.2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining 'investigation' as 'a searching inquiry'). Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors.")

2.     On or about August 8, 2008, Ms. Berrios filed a lawsuit in Fairfax County Circuit Court against Defendant in an action styled *Sandra J. Berrios v. 1st Principle Mortgage, LLC, et al.*, Civil Action No. CL08-12312. *Id*. at ¶ 2.

3.     Flagstar was a co-defendant in the above referenced matter. Before the matter went to trial, Ms. Berrios and Flagstar reached a settlement agreement that resulted in the modification of her mortgage loan, which was owned and serviced by Flagstar as of September 1, 2009. *Id*. at ¶¶ 3-4.

4.     Ms. Berrios has consistently paid her mortgage to Flagstar in accordance with the instructions in the modification agreement. *Id*. at ¶¶ 4-5.

5.     Shortly after she received the modification agreement and dismissed her lawsuit, the servicing rights of Ms. Berrios' loan were sold to Nationstar Mortgage ("Nationstar") in late 2009. Nationstar also erroneously informed Ms. Berrios that she was in default of her mortgage payments. *Id*. at ¶¶ 6-7.

6.     Ms. Berrios, through counsel, contacted Flagstar's counsel, who arranged for Flagstar to reacquire the servicing rights of Ms. Berrios' loan so that it could honor her loan modification. *Id*. at ¶ 8.

7.     Ms. Berrios continued to make her mortgage payments in accordance with her loan modification. Despite her timely payments, Ms. Berrios continued to receive notices from Flagstar that her loan was delinquent. *Id*. at ¶¶ 9-10.

8.     In response to the delinquency notice, Ms. Berrios, through counsel, contacted Flagstar's counsel, who temporarily resolved Flagstar's erroneous accounting. *Id*. at ¶ 11.

9.     Despite the intervention of counsel, Flagstar continued to send Ms. Berrios correspondence that she was delinquent on her mortgage payments. *Id*. at ¶ 12.

10.     On or about September 17, 2010, Ms. Berrios, through counsel forwarded the Defendant a Qualified Written Request disputing that she was delinquent on her mortgage payments and requesting that the Defendant investigate the status of her loan modification. Exhibit "B."

11.     Ms. Berrios did not receive a response to the September 17, 2010, correspondence. *Berrios Decl.* ¶ 14.

12.     Instead, the Defendant began rejecting Ms. Berrios' monthly mortgage payments pursuant to the loan modification. Despite this, to this day, Ms. Berrios still sends her monthly payment in, only to have it rejected by the Defendant. *Id.* at ¶¶ 16-17.

13.     On or about May 11, 2011, Defendant forwarded Ms. Berrios' loan to Samuel I. White, P.C. to institute foreclosure proceedings on her home. *Id.* at ¶ 18, Exhibit "C".

14.     On or about May 31, 2011, Ms. Berrios responded by sending another Qualified Written Request to Flagstar disputing her delinquency, requesting a removal of all delinquent fees and charges, and requesting an investigation into the status of her payment history in accordance with her loan modification. *Berrios Decl.* ¶ 20, Exhibit "D".

15.     Around that same time, Ms. Berrios obtained copies of her credit reports and learned for the first time that Flagstar was reporting her mortgage as delinquent to Experian, Equifax and Trans Union. *Berrios Decl.* at ¶ 22.

16.     Defendant did not provide any response to Ms. Berrios' May 31, 2011, correspondence. *Id.* at ¶ 21.

17.     On June 10, 2011, Ms. Berrios sent notarized written letters to Experian, Equifax and Trans Union disputing the accuracy of the Flagstar account on her credit report. *Id.* at ¶ 23; *See also* Exhibit "E".

18.    In her June 10, 2011, correspondence, Ms. Berrios stated:

- She had a permanent loan modification;

- That she was current on her monthly mortgage payments;

- That she enclosed a copy of her modification agreement; and

-  That she enclosed a copy of her proof of her payments in accordance with the loan modification.

Exhibit E.

19.    With the June 10, 2011 correspondence, Ms. Berrios included twenty-nine pages of documents evidencing proof of her payments under her modification agreement with Flagstar. *Berrios Decl.*, at ¶ 23.

20.    Flagstar has acknowledged that it received these disputes sent through Equifax, Trans Union and Experian.  In the national credit reporting system, such disputes are communicated to a furnisher such as Flagstar as "ACDVs." As Evan Hendricks's ("Mr. Hendricks") Fed. R. Civ. P. 26(a)(2) *Expert Witness Report of Evan Hendricks*  ("*Hendricks Expert Report*"), Exhibit "F," indicates:

-  "[B]ecause the Defendant in this case relied principally on the ACDV-Exchange, they did not consider taking other reasonable investigative steps that could have been more effective for dealing with Plaintiff's disputes" p. 4

- "Flagstar failed to review even some of the quite relevant information it had in its possession that clearly supported Plaintiff's dispute. For example, Flagstar had formal agreements resulting from litigation between itself and Plaintiff that spelled out a modified payment agreement. Flagstar also had records confirming that Plaintiff had complied with this modified payment agreement.

Yet, upon receiving Plaintiff's disputes from the CRAs, not only did Flagstar

not review these records, it did not, as a matter of policy and practice, even

consider reviewing these records" p. 4

20.　　The ACDVs that Flagstar admits receiving are attached as Exhibit "G", Flagstar

Bates Nos. 000915-000918. In the ACDVs communicated to Flagstar, the Plaintiff's disputes

were fully transmitted to Flagstar:

a.　　June 16, 2011- TransUnion- Disputes present/previous Account

Status/Payment History Profile/Payment Rating. Verify Payment History Profile, Account

Status, and Payment Rating.  Exhibit "G", Flagstar Bates No. 000915.

b.　　June 21, 2011- Experian- Disputes present/previous Account

Status/Payment History Profile/Payment Rating. Verify Payment History Profile, Account

Status, and Payment Rating. RDCV LOAN MODIFICATION AGREMENT DTD 9/9/09 AND

RECIEPT OF PAYMNTS WHICH SHOWING THIS ACCT WAS NEVER

DELINQUENT/CURR ACCT.  Exhibit "G", Flagstar Bates No. 000916.

c.　　June 20, 2011- Equifax-  Disputes present/previous Account

Status/Payment History Profile/Payment Rating. Verify Payment History Profile, Account

Status, and Payment Rating.  Exhibit "G", Flagstar Bates No. 000917.

d.　　August 16, 2011- TransUnion- Settlement or partial payments accepted.

Verify current Account Status, Payment Rating, Payment History Profile, and Current Balance.

Disputes present/previous Account Status/Payment History Profile/Payment Rating. Verify

Payment History Profile, Account Status, and Payment Rating.  Exhibit "G", Flagstar Bates No.

000918.

21.     In response to her disputes to the credit bureaus, Flagstar did not correct the inaccurate information they were reporting on Ms. Berrios' credit reports. *Berrios Decl.*, at ¶ 24.

22.     In response to Interrogatories propounded on it by Ms. Berrios, when asked about its factual basis for denial to allegations in the Complaint, the Defendant stated:

> "Prior litigation between the Plaintiff and Flagstar was resolved via a settlement that involved a loan modification. There was an inadvertent error in boarding Plaintiff's loan modification, which resulted in confusion concerning how Plaintiff's account was serviced and how her payments were processed, and, ultimately, the status of Plaintiff's account. Any investigations of the issue would have shown a delinquency because of the boarding problem. Flagstar did not deliberately or willfully do or fail to do anything that resulted in harm to the Plaintiff. Further, Flagstar has reason to believe that Plaintiff was not as forthcoming with complete information as she might have been in resolving this issue and that, at least partially as a result of the same, the issue was not resolved as quickly as it otherwise might have been."

*Flagstar Bank's Supplemental Responses to Plaintiff's First Set of Interrogatories,* No. 13, Exhibit "H."

23.     Mr. Hendricks, in his undisputed expert report, opines that Flagstar had knowledge of the falsity and refused to correct the inaccurate information, despite the compelling information provided by Ms. Berrios. Exhibit F, p. 1.

24.     Mr. Hendricks further opines that Flagstar failed to correct the inaccurate information because it failed to investigate Ms. Berrios's disputes after receiving them from the credit bureaus. *Id*. Mr. Hendricks attributes the lack of a reasonable investigation to Flagstar's policy and practice of restricting its response to "Automated Consumer Dispute Verifications" ("ACDVs"). *Id*. at 2. Under Flagstar's ACDV policy and practice, Mr. Hendricks opines "upon receiving [Ms. Berrios's] disputes from the CRAs, not only did Flagstar not review these records, it did not, as a matter of policy and practice, even consider reviewing these records. This amounted to a serious disregard of its duty to investigate." *Id*.

25.     Instead of reviewing the records submitted by Ms. Berrios, Flagstar compared identifiers and advised Trans Union that the "First Name" and "Last Name" were the same; therefore, the "Result" was the same. *Id*.  Considering that Ms. Berrios was not disputing any aspect of her first or last name, Mr. Hendricks concludes that Flagstar disregarded the very dispute that it was required to investigate. *Id*.

26.     Despite the direct communications and her FCRA disputes, Defendant never removed or corrected its credit reporting. *Berrios Decl*., ¶ 24.

27.     If Defendant would have conducted *any* investigation in response to Ms. Berrios's credit disputes, they would have realized that the credit reporting was inaccurate. *See Hendricks Expert Report,* Exhibit F, pg. 1.

## STANDARD OF REVIEW

**Revised Rule 56 properly provides a mechanism for Partial Summary Judgment.**

Partial summary judgment shall be granted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). [2] Under the new Rule 56, the movant must support its factual position by citation to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence

---

[2] Amendments to Fed. R. Civ. P. 56 were effective December 1, 2010.  Concerning former Rule 56(d), the comments of the Judicial Conference on the rules changes explain, among other things, that the amendments to Rule 56 are "to improve the procedures for presenting and deciding summary-judgment motions, to make the procedures more consistent across the districts, and to close the gap that has developed between the rule text and actual practice  . . . [but] not intended to change the summary-judgment standard or burdens." One of these "salient changes" was to also "explicitly recognize that 'partial summary judgments' may be entered." *Summary Of The Report Of The Judicial Conference Committee On Rules Of Practice And Procedure*, recommended September 9, 2009, approved April 28, 2010; implemented December 2, 2010, pursuant to the Rules Enabling Act, 28 U.S.C. § 2072.

or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A).  This represents no significant change from the standard this court has followed in resolving motions for summary judgment prior to adopting of the new rule.  *See Ratledge v. Science Appl. Int'l Corp.,* 1:10-CV-239, 2011 WL 652274 (E.D. Va. Feb. 10, 2011)(relying on established summary judgment standards where "[t]he inferences drawn from the underlying facts must be construed in the light most favorable to the nonmoving party" and "Rule 56 mandates that summary judgment be entered against a party 'who fails to make a showing sufficient to establish the existence of an element essential to that party's case.'")(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) and quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

Under the new version of Rule 56(c)(1)(B), the movant may demonstrate that there is no dispute of a material nature, including by showing that a non-movant cannot produce admissible evidence to establish or controvert a fact.  This is consistent with the established case law, for example, when the non-moving party will bear the burden of proof at trial, the moving party's burden can be met by "pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.,* 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

In this case, it is the party moving for summary judgment, Ms. Berrios, who bears the burden of proof at trial. Ms. Berrios must establish there is no credible dispute as to the facts. With regard to the Defendant's defense of accuracy and that they conducted a reasonable investigation, the movant has established the material facts necessary to prevail at trial. Ms.

Berrios's undisputed facts are based on the documents she produced in discovery, un-rebuttable expert witness testimony and documents produced by the Defendant itself. With the existence of such evidence, the non-movant may not merely rest on conclusory allegations but must present evidence demonstrating that there is a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 140 (3d Cir. 2004); s*ee also Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 868 (E.D. Va. 2009)(explaining that "a party who raises an affirmative defense but fails to make a sufficient showing on an element of that defense may not defeat summary judgment for the plaintiff").

For the dispute to be considered genuine, the evidence must demonstrate that a reasonable jury could return a verdict for the non-moving party. *Addison v. Brinkman*, No. 3:10cv182, 2011 WL 587005, at *8 (E.D.Va. Feb. 8, 2011). The court may not weigh the evidence or attempt to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

## ARGUMENT

### A.    Overview

Congress enacted the FCRA in 1970 as Title VI of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r ("CCPA"), its omnibus act regulating the consumer credit industry. An overarching, core CCPA theme is that prudent dissemination of accurate credit information is essential to maintain the vitality of the credit granting system in a competitive and open marketplace to insure the health of the nation's multi-trillion dollar consumer credit economy

and the wellbeing of all its participants, creditors and consumers alike.[3]  Congress thus made the

following formal findings in adopting the FCRA:

> The banking system is dependent upon fair and accurate credit reporting.  Inaccurate
> credit reports directly impair the efficiency of the banking system, and unfair credit
> reporting methods undermine the public confidence which is essential to the continued
> functioning of the banking system. § 1681(a)(1).

Congress enacted the FCRA with the express purpose to enable credit grantors and others

to be in the best position to make reliable lending and other business decisions.  § 1681(a) and

(b).  Likewise, the Truth in Lending Act, Title I of the CCPA, establishes the corresponding

principle that consumers are best served through their own "informed use of credit."  15 U.S.C.

§ 1601(a).  "Congress enacted the Truth in Lending Act in part because it believed consumers

would individually benefit not only from the more informed use of credit, but also from

heightened competition which would result from more knowledgeable credit shopping."  *Till v.

SCS Credit Corp*., 541 U.S. 465, 482 (2004) (quotation and footnote omitted).  The Supreme

Court stated the guiding principle of this congressional philosophy nearly 40 years ago: "[B]lind

economic activity is inconsistent with the efficient functioning of a free economic system such as

ours."  *Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 364 (1973).  Simply put, the viability

of our credit economy depends on accurate information; Congress designed the FCRA to

increase that accuracy.

In 1996 Congress amended the FCRA, Pub.L. 104-208 (Sept. 30, 1996), as explained in

the Senate Report:

> Currently, the FCRA contains no requirements applying to those entities which
> furnish information to consumer reporting agencies.  Section 413 imposes certain
> obligations upon those furnishers of information to consumer reporting agencies.
> The Committee believes that bringing furnishers of information under the

---

[3]  Total outstanding consumer credit as of November 2011 was nearly $2.5 trillion.  See
   http://www.federalreserve.gov/Releases/G19/Current, last visited Feb. 8, 2012.

provisions of the FCRA is an essential step in ensuring the accuracy of consumer
report information.

S. Rep. 104-185, 104th Cong., 1st Sess. 49 (1995); see *Nelson v. Chase Manhattan Mortgage*

*Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002).  Among the changes that Congress enacted was

§ 1681s-2, which imposes on those furnishers[4] of information, such as Flagstar, detailed and

specific responsibilities.

This District has long ago provided one of the earliest[5] and most complete summaries of

this FCRA "furnisher" section, which governs the present case, cited verbatim:

> The FCRA places various requirements on consumer credit reporting agencies,
> furnishers of credit information to consumer credit reporting agencies, and users
> of consumer credit reports. These requirements are enforced by civil liability
> statutes and, depending on the statutes implicated, may be enforced by either
> appropriate government officials or private individuals and entities. Sections
> 1681n and 1681o are examples of the latter. Section 1681n provides that "any
> person who willfully fails to comply with any requirement imposed under this
> subchapter with respect to any consumer is liable to that consumer in an amount
> equal to the sum of any damages sustained by that consumer ... or not less than
> $1000" plus reasonable attorney's fees. 15 U.S.C.S. § 1681n. Section 1681o
> establishes similar liability for any person who negligently fails to comply.
> Section 1681s–2 may be functionally split into two distinct subparts. First,
> subsections (a), (c), and (d), delineate the following responsibilities. Subsection
> (a) imposes duties upon furnishers of credit information to provide consumer
> reporting agencies with accurate information. Subsections (c) and (d), limit the
> remedies available for violations of subsection (a). In particular, subsection (c)
> eliminates the availability of direct remedies to consumers by making Sections
> 1681n and 1681o inapplicable to violations of subsection (a). Subsection (d)
> provides that the requirements imposed by subsection (a) are only enforceable by
> government officials.

---

[4] A furnisher is defined as a person who "regularly and in the ordinary course of business
furnishes information to one or more consumer reporting agencies about the person's transactions
or experiences with any consumer." 15 U.S.C. § 1681s-2(a)(2).

[5] The Court's opinion in *Ayer*s was actually decided earlier than Judge Wilkins' opinion in
*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426 (4th Cir. 2004) and Judge Motz's opinion in
*Saunders v. Branch Banking & Trust Co. of VA*, 526 F.3d 142 (4th Cir. 2008), both of which
accepted the same conclusions as to a § 1681s-2(b) as did the Court in *Ayers.*

*Ayers v. Equifax Info. Servs.*, No. 3:03CV551, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003). As currently enacted, § 1681s-2(b) requires:

**(b) Duties of furnishers of information upon notice of dispute**

**(1) In general**

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

**(A)** conduct an investigation with respect to the disputed information;

**(B)** review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

**(C)** report the results of the investigation to the consumer reporting agency;

**(D)** if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

**(E)** if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

**(i)** modify that item of information;
**(ii)** delete that item of information; or
**(iii)** permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b). Ms. Berrios alleges that Defendant violated these provisions.

Fair Credit Reporting Act cases based on a furnisher defendant's failure to investigate and correct credit information nearly always required proof of the same narrow set of liability elements: (1) Was an "investigation" conducted? (2) Was the investigation "reasonable"? (3) Was the disputed information "inaccurate"? (4) Did the furnisher defendant correctly respond to the dispute after the investigation process?

While some of these questions remain jury questions, two of the four elements do not because there is no doubt that Defendant did not conduct a reasonable investigation and the information on Ms. Berrios's credit report was inaccurate. *See Johnson,* 357 F.3d at 431-32; *Robertson v. J.C. Penney Co., Inc.*, No. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008) (Granting summary judgment for consumer when furnisher's investigation consisted of merely comparing the ACDV to its computer records); *See also Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1071 (9th Cir. 2008) ("A reinvestigation that overlooks documents in the court file expressly stating that *no* adverse judgment was entered falls far short of this standard. On our own motion, therefore, we grant summary judgment[.]"); *See also Alabran v. Capital One Bank*, No. 3:04CV935, 2005 WL 3338663 (E.D.Va. Dec. 18, 2005).

Accordingly, summary judgment on these core elements with facts that cannot be disputed, and thus are established, will provide a clear, concise and efficient tableau upon which to present to a jury the material facts that remain in dispute. Moreover, summary judgment would reduce the large range of discovery and evidence that currently confronts the Parties, reduce the trial to a day and reduce the vast gap between the Parties' understanding of the governing law, which would enable each side to rationally resolve the cause without further judicial notice.

**B. As a matter of law, Defendant did not conduct a lawful investigation in response to Ms. Berrios's FCRA disputes.**

Ms. Berrios's primary FCRA claim under § 1681s-2(b) is for Defendant's failure to conduct a reasonable (or any) investigation of her many disputes conveyed through the national consumer reporting agencies. The leading case in this regard is the Fourth Circuit's *Johnson v.*

*MBNA Am. Bank, NA,* 357 F.3d at 431-32 (affirming jury verdict before Judge Williams for a furnisher violation of § 1681s-2(b)).  Johnson and its progeny long ago established that the § 1681s-2(b)(1)(A) directive to furnishers to "conduct an investigation with respect to the disputed information" required a "reasonable investigation," that is, a "careful" or "searching inquiry," as opposed to a "superficial" one, "to determine whether the disputed information can be verified."  *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004).  The Courts of Appeals continue to unanimously follow this "reasonable investigation" standard. *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, L.L.P.*, 584 F.3d 1147, 1157 (9th Cir. 2009). *See also Robertson v. J.C. Penney Co., Inc.*, No. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008).  This standard for an investigation is a rigorous one, requiring more than a superficial data conformity check of comparing the CRA identifying information for the disputed account the furnisher's computer data (requiring more than matching social security number, date of birth and name).  In a more recent decision adopting the Fourth Circuit's Johnson standard, the Court of Appeals for the Ninth Circuit explained:

> The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. **By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.** Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." *Nelson,* 282 F.3d at 1060. **A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.**

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155-56 (9th Cir. 2009) (emphasis added).

Generally, it has been considered to be a jury question whether the furnisher has instituted and complied with the requirement to implement and follow reasonable procedures. *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 416-17 (4th Cir. 2001) ("The issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.'"); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995). *See also Andrews v. TRW Inc.,* 225 F.3d 1063, 1068 (9th Cir. 2000) ("'It would normally not be easy for a court as a matter of law to determine whether a given procedure was reasonable in reaching the very high standard set by the statute ....'"). However, when a plaintiff carries her burden of proving that the defendant's procedures were unreasonable because they provide no avenue to correct a known inaccurate report and no meaningful investigation, then no reasonable jury could ever find in favor of the defendant. *Johnson*, 357 F.3d at 431-32; *Saunders*, 526 F.3d at 148-49; *see also Addison,* 2011 WL 587005, at *8-9 (describing the circumstances where, on summary judgment, a court may resolve factual disputes when the non-moving party's evidence simply "strains credulity").

In this case, the actual degree or quality of investigation is not an issue. Rather, Defendant either did not undertake any investigation, or the investigation was so poor that it overlooked documents in Defendant's possession expressly indicating that there was a loan modification- documents that were in the Defendant's possession. At all relevant times, Defendant was in complete and utter control of all information necessary for it to know that Ms. Berrios had a loan modification – including the actual agreement and multiple correspondences referencing the loan modification and requesting an investigation of the same. This is even more apparent given the fact that Defendant's own

Interrogatory response that stated, "*any investigations would have shown a delinquency because of the boarding problem.*"  *See* Exhibit F. However, the loan modification agreement and the multiple qualified written requests were in the Defendant's possession, but the Defendant's procedure for an investigation goes no further than its computer system. Thus, it is factually impossible for Defendant to produce any evidence that it engaged in a meaningful, searching investigation required under the FCRA and *Johnson* when an investigation of documents within its possession would have been sufficient evidence to establish that Ms. Berrios had entered into a valid loan modification agreement.

Despite the fact that Defendant had the documents in its own possession, in order to establish liability under the FCRA, Ms. Berrios had to dispute the inaccurate reporting, not to Defendant, but to the CRAs. This she did multiple times. In her dispute letters to the CRAs, Ms. Berrios expressly indicated that the Flagstar account on her credit reports was not delinquent and subject to a loan modification that she was compliant with. The CRAs all sent ACDVs to Defendant reflecting this information. If Defendant had a procedure by which it would have conducted even a minimal inquiry in response to Ms. Berrios' dispute, either directly to it or to the CRAs, Ms. Berrios' consumer report would have been corrected and the derogatory information deleted as required by the FCRA and the settled law of the Fourth Circuit. No reasonable jury could find otherwise. *Addison* 2011 WL 587005, at 8-9; *Bell Microproducts, Inc.*, 20 F.Supp.2d at 941; Ex. H, no. 13.

**C. Defendant's credit reporting was inaccurate. Ms. Berrios was not delinquent on her mortgage loan.**

18

Defendant reported to the "Big Three" consumer reporting agencies – Equifax,

Trans Union and Experian – that it had verified that Ms. Berrios was severely delinquent

on her mortgage loan. Although there is no doubt that Defendant failed to conduct a

meaningful investigation, this would not matter if what was ultimately "blindly" verified

was accurate regardless of the quality of the investigation. Whether a furnisher gets the

correct answer by "dumb luck" or through lawful investigation, an accurate answer

precludes a consumer from prevailing in a § 1681s-2(b) case. Thus, a consumer must

show (either as a liability or a damage element – courts see it both ways) that the

challenged reporting was in fact accurate. *Beattie v. Nations Credit Fin. Servs. Corp.*, 69

F. App'x 585, 591 (4th Cir. 2003) (explaining "as we have stated previously, the

information NationsCredit reported to the credit bureaus was accurate … [t]herefore, the

Beatties have failed to show that the FCRA provides an actionable duty[.]").

An accuracy decision is uniquely suited to be decided by summary judgment.  In *Alabran*

*v. Capital One Bank*, Judge Dohnal granted the consumer-plaintiff's motion for partial summary

judgment in a FCRA § 1681s-2(b) case arising from a wife's unauthorized use of her husband's

identity (they were estranged as of the date the case was filed).  In such a fact pattern, weaker

than the one now before the Court, Judge Dohnal held:

> The court concurs that there are no disputed material facts remaining after
> resolution of the Defendant's motion concerning whether the Plaintiff was or was
> not obligated on the subject indebtedness such that the resolution of the issue of
> the accuracy of the information is a question of law that would have to be
> resolved by the court anyway at some point. Accordingly, the motion will be
> entertained and GRANTED for the reasons already discussed.

*Alabran*, 2005 WL 3338663.[6]

---

[6] In contrast, In *Mullins v. Equifax Information Services, LLC*, Judge Payne granted the
consumer-plaintiff's motion *in limine* and request for a jury instruction advising the jury
that:  "*Trans Union reported that Ms. Mullins was contractually responsible for the credit*

There is no question in this case that Defendant's reporting was not accurate. Ms. Berrios was compliant with the loan modification agreement.  Ms. Berrios does not again need to restate the same details. But the simplest accuracy facts are these: Ms. Berrios – by affidavit and initial disclosures in this case – provided unqualified testimony that she was current of her obligations under the loan modification agreement.

In addition, Defendant's own Interrogatory responses acknowledges that there was an "inadvertent error" in its processing of Ms. Berrios' loan modification that resulted in "confusion how Plaintiff's account was serviced and how her payments were processed and, ultimately, the status of Plaintiff's account." *See* Exhibit H.

Defendant's credit reporting was objectively inaccurate. Based on the foregoing, it appears there is not dispute that Ms. Berrios was not in default of the loan modification. Therefore, Ms. Berrios is entitled to summary judgment on this important element of her claim.

## CONCLUSION

Accordingly, for the reasons stated fully herein, the Plaintiff, SANDRA BERRIOS, asks the Court to enter Partial Summary Judgment in her favor and such other relied it finds just and appropriate.

Respectfully submitted,

**SANDRA J. BERRIOS**

By_____/s/_____
Susan Rotkis, Esq. VSB #40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1A

---

*card accounts in dispute here.  You are instructed that Trans Union was inaccurate in reporting that Ms. Mullins was contractually responsible for these accounts."* 3:05CV888, Jury Instruction 16.

Newport News, Virginia 23601
(757) 930-3660
(757) 930-3662 facsimile
srotkis@clalegal.com

Kristi Cahoon Kelly, VSB #72791
SUROVELL ISAACS PETERSEN & LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400
(703) 591-9285
kkelly@siplfirm.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1A
Newport News, Virginia 23601
(757) 930-3660
(757) 930-3662 facsimile
lenbennett@cox.net

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been filed in the CM/ECF system, which shall electronically forward it to the following on this the 16th day of February, 2012, as follows:

George Kostel, Esq., VSB #34757
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., NW, Suite 900
Washington, DC 20001
Tel: (202) 712-2800
Fax: (202) 712-2860
Email: George.Kostel@nelsonmullins.com

*Attorney for Flagstar Bank, FSB*

_____/s/_____

Susan Rotkis, Esq. VSB #40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1A
Newport News, Virginia 23601
(757) 930-3660
(757) 930-3662 facsimile
srotkis@clalegal.com