## PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled *Sandra J. Berrios v. Experian Information Solutions, Inc., et al.*: U.S. District Court for the Eastern District of Virginia; No.: 1:11-CV-01130.

**Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Chase on notice of the problems in this case and why Chase should have prevented them, and how Chase' failures damaged Plaintiff.   **Part 2** includes my qualifications, list of prior cases in which I have testified and my fee.   If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

### Summary of Opinions

- Despite Defendant Flagstar's ("Flagstar") knowledge of the falsity of highly damaging inaccuracies it was furnishing to consumer reporting agencies (CRAs), and despite compelling information provided by Plaintiff, Flagstar refused to honor Plaintiff's genuine disputes and instead allowed inaccurate, derogatory data to remain on Plaintiffs' credit reports.   In other words, Flagstar unilaterally caused Plaintiff's problems and then refused to fix them.

- A central reason that Flagstar failed to correct the highly damaging inaccurate data it had previously furnished to CRAs was because after receiving Plaintiff's disputes from the CRAs, Flagstar failed to investigate them – despite its duty to do so. Instead of, Flagstar engaged in a cursory comparison of identifiers and other rudimentary data that was not reasonably calculated to determine the underlying truth or whether Plaintiff's disputes should be honored. This meant that Flagstar engaged in "parroting" rather than conduct true investigations of Plaintiff's disputes.   This greatly compounded the economic and non-economic damage to Plaintiff.

- The inaccurate Flagstar account was the predominant reason for the damage to Plaintiff's creditworthiness.   This is because the inaccurate account constituted a major derogatory under the FICO scoring model.   The Flagstar account also impeded Plaintiff's credit transactions.

- Upon receiving disputes directly from Plaintiff, Flagstar consistently failed its duty to notate her account as "Disputed by Consumer" by using the "Compliance Condition Code" ("CCC") known as "XB." This was significant because notating an account as "Disputed by Consumer" would have prevented damage to Plaintiff's credit score.

- Adding to the likelihood that Flagstar would furnish inaccurate data was the fact that Plaintiff's mortgage loan had been "modified" after litigation. Loan modifications were a relatively new phenomenon that introduced new "wrinkles" into the relationship between mortgage lenders and their customers. Consequently, these new

1


EXHIBIT
F

variables increased the possibility of credit report inaccuracy.  Nonetheless, Flagstar was fully aware of, and had agreed to the terms of, Plaintiff's mortgage modification.

- From 1996 to the present, Flagstar, were put on notice by a variety of events of the importance of credit report accuracy and their duty to conduct reasonable reinvestigations.  Yet despite the abundance of notice, they failed to adopt practices and procedures that would have prevented and/or cured the inaccuracies that damaged Plaintiff.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms.  The damages suffered by Plaintiff were consistent with those experienced by other victims.  In addition, Plaintiff suffered damages – both economic and non-economic – that were particular to her situation.

### Flagstar & The 'ACDV Exchange'

It is important to understand that Flagstar relies on the ACDV-exchange as its principal means of responding to a consumer's dispute.  When relied on exclusively and operated defectively, as Flagstar did in Plaintiff's case, the ACDV-exchange has been widely criticized for being inadequate to reasonably investigate disputes such as Plaintiff's that require careful consideration and the goal of determining the underlying truth.

The ACDV-exchange essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs).  When the consumer sends his dispute to the CRA, the CRA populates the ACDV form with his identifying information (name, address, city-state-zip, SSN, sometimes previous address),[1] and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not liable," or "not mine," or "never late," or "fraud").  In many types of disputes, the ACDV instructs the furnisher to provide "complete ID."

Upon receipt of the ACDV form, the furnisher will advise the CRA if a sufficient number of identifiers (i.e., name, Social Security number) match up and then "instruct" the CRA to either delete, modify, or "verify" the information so that it remains.

Thus, this process is better described as a *comparison* of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

As this case illustrates, there can be several problems with the ACDV-exchange serving as the principal means of a furnisher like Flagstar for responding to consumer disputes.  First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word.  The Webster's New Collegiate Dictionary defines "investigate" as, "v.  To observe or study by close examination and systematic inquiry.  Systematic—adj.  Marked by thoroughness and regularity."  An exchange of messages is neither a "study by close examination" nor

---

[1] The CRAs often refer to identifiers as "indicative data"

"marked by thoroughness and regularity," in my opinion. This means, simply, that Flagstar did not investigate Plaintiff's disputes – despite its clear duty to do so.

Second, because of it policy and practice of restricting its response to the ACDV exchange, coupled with the hurried, conveyer-belt-styled environment in which that occurs, Flagstar failed to review even some of the quite relevant information it had in its possession that clearly supported Plaintiff's dispute. For example, Flagstar had formal agreements resulting from litigation between itself and Plaintiff that spelled out a modified payment agreement. Flagstar also had records confirming that Plaintiff had complied with this modified payment agreement. Yet upon receiving Plaintiff's disputes from the CRAs, not only did Flagstar not review these records, it did not, as a matter of policy and practice, even consider reviewing these records. This amounted to serious disregard of its duty to investigate.

Third, because of the emphasis on comparing identifiers, Flagstar failed to comprehend both the essence of the dispute and what corrective measures it needed to take. For example, the June 16, 2011 TransUnion ACDV advised Flagstar that Plaintiff "Disputes present/prev Acct Status, pymt Hist, Profile, Pymt Rating. Verify Pymt Hist Profile. Acct Status and Rating." [TU 84]

However, as noted above, Flagstar did not even consider reviewing the records it needed to review in order to reasonably investigate Plaintiff's dispute. Instead, Flagstar compared identifiers and advised TU that the "First Name" and "Last Name" were the "same" and therefore the "Result" was the "same." Considering that Plaintiff was not disputing any aspect of her first or last name, Flagstar's response was farcical. Thus, even within the ACDV-exchange, Flagstar disregarded the very dispute it was supposed to investigate.

Fourth, in a case like this, where mistakes in the original furnishing *were the cause* of the inaccuracy in the victim's credit report, the ACDV-exchange sometimes is not reasonably calculated to successfully determine whether a consumer's dispute should be honored. Thus, given that it doesn't review its own relevant records and only compares identifiers, when Flagstar in this case received the ACDV from the CRAs, there was a strong possibility that Flagstar would merely confirm or wrongly "verify" the inaccurate information it had previously reported, or even worsen the information through modification. Again, this is because in the ACDV-exchange process, Flagstar merely compares identifiers, and restricts it remaining focus on the information it previously furnished. Accordingly, I am aware of several cases in which CRAs and furnishers like Flagstar told consumers they had "verified" information that was in fact false.

Fifth, because Flagstar in this case relied principally on the ACDV-Exchange, it did not consider taking other reasonable investigative steps that could have been more effective for dealing with Plaintiff's disputes. For example, in her disputes, Plaintiff reminded Flagstar of her contact information. But Flagstar did not use the contact information to resolve the problem effectively.

3

### Damaging Nature of Inaccuracies

The inaccuracies on Plaintiffs' credit reports were damaging in several ways. First, the inaccurate fraudulent accounts on Plaintiffs' credit reports qualified as major derogatories that ensured significant damage to their credit score. The more recent a derogatory tradeline, the more damaging it is to a consumer's credit score. (See below, "Nature and Purpose of Credit Scores.")

Second, at times the inaccurate data furnished by Defendants portrayed Plaintiffs as having debts that were currently outstanding. When this happens, it typically means that a creditor will not extend credit to applicants until they "resolve" the outstanding debt. A consumer can "resolve" it by disputing it and removing it from his credit report. However, given the difficulty that this can entail, it is often easier and faster to resolve it by paying it. But Plaintiffs justly refused to do this.

The damage to Plaintiffs caused by Defendants' unreasonable responses, and which remained because of Defendants' inadequate investigations, were the predominant reasons for the damage to the Plaintiffs' creditworthiness, and consequently, for their inability to obtain credit on the favorable terms to which they would have been entitled but for Defendants' failures.

### 'Non-Economic' Damages

The above cited "economic" damages are easier to identify and quantify, and therefore easier for some people to understand.

In my experience, however, in the cases of victims of chronic credit report inaccuracy, the damage to one's well-being and lifestyle are often much more profound. For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is reflected in FTC complaint statistics. People like Plaintiffs who have worked hard for years to maintain their good name in the credit world describe it as extremely hurtful to be portrayed by supposedly reputable, nationwide organizations as irresponsible deadbeats. But that is only the beginning of the harm.

To fully understand the nature of the damage, it is necessary to recognize the interrelationship between the "economic" and "non-economic" damage. The inaccurate tradeline set off a chain reaction that ultimately cast a dark shadow over her life. As their credit reputations were besmirched, victims of chronic inaccuracy find that opportunities once taken for granted are vanishing. Plaintiffs' was a case in point.

But the inaccuracies caused by Defendants severely strained their credit standing, and directly and persistently interfered with any hopes they had to resume a normal life.

This assuredly impacted how Plaintiffs felt about herself in particular and about life in general, as well as her interpersonal relationships. Like other victims of chronic inaccuracy,

Plaintiffs' plight symbolizes the nature of, and interrelationship between, "economic" and "non-economic" damage.

Now consider the impact that such an environment would have on a reasonable person's psyche, inter-personal relationships, ability to concentrate, organize and perform at work, and ability to enjoy life. Clearly, any reasonable person would be negatively impacted.

Greatly compounding the harm is the frustration, stress, and trepidation that victims such Plaintiffs' endure as they are unsuccessful in their reasonable attempts to restore accuracy to their credit life. The truth was that Plaintiffs' account should not have been depicted as seriously delinquent. However, supposedly reputable institutions like Defendants were effectively telling the financial services industry through the credit reporting system that Plaintiffs were irresponsible deadbeats. Plaintiffs truthfully told Defendants they were being unfairly and inaccurately associated with derogatory data. Yet Defendants disregarded the essence of their disputes, as well the Defendants' duty to reasonably investigate them and restore accuracy.

### Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy/Identity Theft

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts.

### Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

5

### Plaintiffs' Damages Were Consistent with Other Victims
### of Credit Report Inaccuracy

Plaintiffs' damages were consistent with other victims of chronic credit report inaccuracy. Their experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[2] It can be difficult to perform adequately at one's job.

### Defendant Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to Defendants that failing to prevent Plaintiffs from becoming a victim of chronic inaccuracy would have a highly negative impact on her.

### Defendant Damaged Plaintiff's Privacy

In addition to the damages described above, Defendant damaged Plaintiff's privacy. As the U.S. Supreme Court has recognized, "To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." (See *U.S. Dept. Of Justice v. Reporters Committee*, 489 U.S. 749 [1989].)

And, as the Supreme Court also has recognized, "… the concept of personal privacy … is not some limited or 'cramped notion' of that idea." (See *Favish v. National Archives & Records Administration*, 541 U.S. 157 [2004].)

These are some of well-known, long-standing privacy interests of Plaintiff that Defendant damaged:

- The Right To Be Let Alone – The Right To Protection of Private Life
- Reasonable Control Over Personal Information
- Intrusion upon seclusion or solitude, or into private affairs
- Public disclosure of embarrassing private facts
- Publicity which places a person in a false light in the public eye

### Defendant Knew or Should Have Known Its Actions Would Have Negative Impact

The history of credit reporting cited above, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books made it abundantly clear to Defendant that failing to prevent Plaintiff

---

[2] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

from becoming a victim of chronic inaccuracy would have a highly negative impact on him.

## Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from CRA and furnisher practices and policies, mixed files or identity theft, are long-standing and well-known problems. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[3] Accordingly, I provide a brief history. An important theme emerging from this history is that Defendant was consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also put Defendant on notice of the potential damage to consumers of wrongly mixing erroneous information into the file of an innocent consumer and then failing to correct it.

## History of Significant Inaccuracy Problems

To understand why Defendant's actions in relation to Plaintiff were egregious it is necessary to put his case in the proper context.

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[4] This history is covered in Chapter 10 of my book, "Credit Scores and Credit

---

[3] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

[4] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me?  The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993,

Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC.

Of particular note was the 1993 study done by the U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian's predecessor ("TRW") and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

In 1991, TRW signed a "Consent Order" with 18 State Attorneys General (AGs). In subsequent years, Equifax and Trans Union signed similar orders with AGs and/or the FTC.

The first problem identified by the 1991 State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a ***"Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."*** A similar FTC Consent Order's definition of Mixed File was identical.

The Agreement also emphasized the importance of using ***"full identifying information,"*** defined as ***"full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."***

---

Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" ConsumerReports.org, July 2000.

Consumer Federation of America and National Credit Reporting Association, Credit Score Accuracy and Implications for Consumers, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," Federal Reserve Bulletin, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

Finally, the agreement defined "Derogatory Information," as:

> ... Information in a Consumer Report or File indicating a bankruptcy adjustment plan, bankruptcy, liquidation, reorganization, charge off, collection account, charge off now paying, deed in lieu of foreclosure, foreclosure proceedings, government claim, late payment, paid by dealer, paid charge off, paid collection account, paid foreclosure, paid repossession, repossession, judgment or tax lien.

I cite these consent agreements to illustrate that they, along with the independent studies, media attention and four years of Congressional hearings on the same issue, robustly put Experian on notice as to the very issues at issue in this case: that an approach to partial matching that does not adequately rely on full identifying information has the potential to cause the wrongful mixing and therefore serious damage to consumers like Plaintiff.

### History: Increased Attention on Role of Furnisher

This history and the Consent Agreements are relevant because they provided the foundation for the 1996 Amendments to the FCRA, which was the first major strengthening of the Act's consumer protections, and which was the first to impose duties on furnishers like Defendant and to create a private right of action for consumers when furnishers violated the new investigation requirements.

As the April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary:

> Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.* [Emphasis Added]

Thus, Defendant has been expected since 1997 to comply with the FCRA provisions that are relevant in this case.

### Notice: 2003 FACT Act Amendments, Congressional Testimony

In fact, Congress re-visited the FCRA, devoting all of 2003 to extensive hearings and concluding with sweeping amendments to bolster consumers' rights to accuracy and fairness.

Included in the amendments were new provisions that strengthened the duty on furnishers like Defendant to ensure the accuracy of the information they furnish to CRAs. Below is the original standard from the 1996 Amendments, which is then followed by the 2003 strengthened, amended provision, which Congress felt was necessary because furnishers like Defendant continued to be a consistent source of inaccuracy:

> **§ 623. Responsibilities of furnishers of information to consumer reporting agencies**   [15 U.S.C. § 1681s-2]
>
> (a) Duty of Furnishers of Information to Provide Accurate Information
> (1) Prohibition
> (A) *Reporting information with actual knowledge of errors.* A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

In the 2003 FCRA Amendments, known as the FACT Act, Congress tightened this standard by replacing the rather weak "knows or consciously avoids knowing" standard with the "knows or has reasonable cause to believe" standard.

During the 2003 House hearings on the FACT Act Amendments, several witnesses testified about some furnishers' consistent failure to live up to their accuracy duties, both in furnishing and in responding to consumer disputes.

Leonard Bennett, a consumer attorney specializing in FCRA cases who previously had sued other furnishers over inadequate investigations, was sharply critical of their "investigations" procedures in his testimony, stating that these furnishers "confessed to a policy of automated investigations in which the consumer has almost no hope of obtaining relief. The furnishers merely proofread the form from the CRA and match it to the data within their computer's account screen." (Testimony Leonard Bennett before the Subcommittee on Financial Institutions And Consumer Credit of the Committee on Financial Services, Regarding, "Fair Credit Reporting Act: How it Functions for Consumers and the Economy;" June 4, 2003.  http://financialservices.house.gov/media/pdf/060403lb.pdf)

### Notice – 4th Circuit's Opinion in <u>Johnson v. MBNA</u>

Two federal courts – U.S. District Court for the Eastern District of Virginia and the U.S. Court of Appeals for the Fourth Circuit – issued opinions that held unequivocally that the type of ACDV-Exchange-and-ID-data-comparison conducted by a furnisher did not amount to a reasonable investigation under the FCRA. I quote at length from these two opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers regarding the need to change their investigation procedures.

By way of background, the FCRA lawsuit, filed by Leonard Bennett, stemmed from an MBNA MasterCard opened by plaintiff Linda Johnson's ex-husband, Edward Slater, in

1987 – four years before he married her. They had since divorced. Johnson said she was only an authorized user, which meant she was not responsible for paying the account. In December 2000, Slater filed for bankruptcy, and MBNA promptly removed his name from the account. That same month, MBNA contacted Johnson and informed her that she was responsible for the approximately $17,000 balance on the account. After obtaining copies of her credit report from Experian, Equifax, and Trans Union, Johnson disputed the MBNA account with each of them. Experian and Trans Union sent automated consumer dispute verifications (ACDVs) to MBNA specifically indicating Johnson's claim that she was not a co-obligor on the account.

MBNA agents responded by conducting the ACDV-Exchange, comparing the disputed data with the account information contained in MBNA's computerized Customer Information System (CIS). Since the two were identical, MBNA "verified" that the disputed information was correct. In other words, MBNA did nothing more than confirm that it indeed reported the original (inaccurate) data. The CRAs continued to report it on Johnson's credit report.

Tricia Furr, an MBNA credit reporting specialist, confirmed that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN. Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported." Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[5]

Reading from MBNA's internal records, MBNA Vice President Edward Hughes quoted an MBNA employee's communication to a customer's attorney: "It would be up to (c)ard holder to prove MBNA was reporting wrong, not MBNA proving right."

The jury disagreed with MBNA's argument that its actions did not violate the FCRA, and awarded Johnson $90,300 in damages.

Judge Richard Williams affirmed the jury verdict. "According to [MBNA], the duty to investigate means that any investigation is sufficient, no matter how cursory. Such a construction is illogical. There would be no point in having the statute, and the requirement of an investigation, if there was no qualitative component to the investigation. The statute itself does impose a qualitative component to the [MBNA's] negligence," Judge Williams said.[6]

MBNA appealed Judge Williams' decision. But on February 11, 2004, a three-member panel of the U.S. Court of Appeals for the Fourth Circuit affirmed, finding that MBNA's standard response to consumer disputes did not amount to a true "reinvestigation" under the FCRA.

"MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a

[5] The depositions of MBNA personnel were taken in the case, Linda Johnson v. MBNA America Bank, N.A., Slip Op. No. 3:02 cv 523, U.S. District Court For The Eastern District of Virginia (Richmond Division).
[6] Johnson v. MBNA, op. cit., bench ruling February 24, 2003

minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkens. "Stated differently, MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."[7]

"The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.' Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors. We therefore hold that § 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."

MBNA also tried to argue that its investigation in Johnson's case was reasonable. But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

"The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS," Judge Wilkens wrote.

When read in conjunction with the Third Circuit's opinion in *Cushman v. Trans Union Corp.*, (115 F. 3d 220, 225 (3d Cir. 1997)), which held that "parroting" did not amount to an adequate investigation, Johnson should have made it perfectly clear to Defendant that they needed to conduct a true, qualitative investigation in response to Plaintiff's disputes.

### Standardized Industry Forms

The need to heighten furnishers' standard of care in credit reporting is also reflected in the standardized form that the furnishers use to unilaterally instruct CRAs to make changes in consumers' files. The forms, known as Universal Data Forms (UDFs), were created by the credit reporting industry as part of its system for exchanging communications between CRAs and furnishers. (UDFs sent electronically are referred to as Automated Universal Data forms,

---

[7] Johnson v. MBNA America Bank: 357 F.3d 426 (4th Cir. 2004).

or AUDs). Verbiage at the bottom of the UDF reminds the furnisher, "When you sign this form, you certify that your computer and/or manual records have been adjusted to reflect any changes made."

The same is true on the Consumer Dispute Verification (CDV or ACDV) that furnishers like Defendant receive from CRAs when a consumer disputes data in their credit file. These forms are used by furnishers to report to the CRAs the results of their "investigation." In case the furnisher instructs the CRA to make changes, this standardized language appears at the bottom of the form: "When you sign this form you certify that you have verified the accuracy of the entire item and that you [sic] company's records will be adjusted to reflect the changes noted above."

Thus, furnishers like Defendant have been specifically notified by statute, by legislative history, by industry enforcement actions, by court opinions and by standardized industry forms and manuals that they need to ensure that inaccurate data are removed from their routine systems to ensure that bad data are not wrongly reported to CRAs. Despite this extensive notice, however, Defendant failed to remove inaccurate information from its routine systems, and therefore, continued reporting it, in the case of Plaintiff. Plaintiff even told Defendant that this was the problem in his case.

All of the above sections on "context" are relevant for several reasons, including foreseeability,[8] in my opinion.

---

[8] (See *Eric R. Drew v. Equifax Information Services*, LLC: USDC-N.D. Calif. – No. C 07-00726 SI, "Order Denying Defendant's Renewed Motion For Judgment As A Matter Of Law And Alternative Motion For A New Trial," Judge Susan Illston, writing, "Plaintiff's expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case. As part of his testimony, and over defendant's objection, Mr. Hendricks discussed a 1995 consent order between defendant and the Federal Trade Commission and a 1992 "Agreement of Assurances" between defendant and a number of states." ...

"Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them. Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft. As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency. *See* TR 621:5–621:15. This shows that the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness." ...

"Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record. A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged account simply by asking the bank to reconfirm the account, without even indicating that the consumer has reported that his identity was stolen. Such a conclusion would be particularly reasonable in this case, where fraud alerts were placed on the account and other credit cards had been deleted." ...

"Defendant is not entitled to JMOL on the question of willfulness."

In a footnote, Judge Illston added, "Defendant argues that it is being punished for earlier, dissimilar acts that were the subject of the FTC order and the Agreement of Assurances about which Mr. Hendricks testified. Any danger that defendant was punished for the actions that were subject to the FTC order and the Agreement of

**Mortgage Modifications: Confusion & Change, Including Credit Reporting**

The crisis that hit the U.S. financial system in 2008 had significant implications for the then-booming U.S. mortgage market. The combination of falling real estate prices with the proliferation of high-risk, sub-prime loans, meant that many Americans owed more on their mortgages than their houses were worth.

This in turn prompted the creation of an unprecedented mortgage modification program in which mortgage lenders, such as Flagstar, supposedly agreed to lower or otherwise modify payment terms so consumers could meet their obligations.

As a new program that was hit with a tsunami of applications from hundreds of thousands of consumers who were desperate to avoid foreclosure, the mortgage modification programs was plagued with problems and the target of thousands of consumer complaints.

In addition to confusion among applicants who were told they had been qualified for a mortgage modification, when in fact they had not been, the program generated a great deal of confusion and inaccuracy in credit reporting. For example, by 2011, Bank of America had completed 840,000 loan modifications since 2008.[9]

The credit reporting industry quickly recognized that mortgage modifications represented a potential disruptive "monkey wrench" to the system. In May 2009, the Consumer Data Industry Association (CDIA), which is the trade association representing consumer reporting companies and which is dominated by the "Big Three" – Equifax, Experian and TransUnion – announced it was holding an extra webinar on mortgage reporting:

> Because of the tremendous response we have received in regard to our Metro 2 webinar on Mortgage Reporting Guidelines, we have scheduled an additional session for you. (May 7, 2009 e-mail from CDIA.)

In conjunction with the webinar, the CDIA released a new manual specifically addressing the "challenging" new issue of loan modifications: "A new tool for you is our latest guidance on Metro 2 Reporting and the Mortgage Loan Modification Program (HMP).

The topics addressed in the webinar included:

> The better you understand Metro 2, the more precise and successful your reporting will be.

---

Assurances is outweighed by the relevance of the documents and Mr. Hendricks's testimony to the question of foreseeability and thus willfulness, which are properly considered by a jury when calculating punitive damages."

[9] Rick Rothacker & Kirsten Valle Pittman, "Bank of America Challenged Over Mortgage Practices," May. 12, 2011, The Charlotte Observer. www.charlotteobserver.com/2011/05/12/2290258/bofa-challenged-over-mortgage.html

For example, do you know how:

- To report mortgage loans that have been refinanced or renegotiated?
- The Original Loan Amount should be reported for an Adjustable Rate Mortgage when the principal balance increases?
- To report mortgage accounts when you have agreed to a short sale?

The presenters at the CDIA Webinar were: Sandy Lugiai, DAS Consultant with TransUnion, Debbie Seneway, Educational Consultant with Experian and Julie Blubaugh, Quality Assurance Analyst with Innovis.

Thus, Defendant CRAs were well aware that mortgage modifications posed a challenge to the accuracy of credit report data.

In addition, thousands of consumers complained about problems with mortgage modifications, prompting both media coverage and investigations by enforcement authorities, like State Attorneys General.

Washington Attorney General Rob McKenna said his investigation has turned up additional problems in the foreclosure process.

McKenna said homeowners who believe they have a legitimate reason to stop a foreclosure should contact their trustee immediately, preferably with the advice of a housing counselor or an attorney. Foreclosure trustees have the power to postpone a foreclosure sale whenever they think it is advantageous. Some possible *reasons for stopping a foreclosure* include: a *mortgage servicer failed to credit payments*, the homeowner never received notice of the foreclosure, *one division of the mortgage servicer promised a loan modification while the other started the foreclosure process*, the homeowner has a genuine contract to sell his home but the servicer will not respond to the sales offer.[10]

The industry was aware of a high prevalence of problems in the months leading up to plaintiffs' disputes. For example, in July 2009 Diane E. Thompson of the National Consumer Law Center submitted testimony to United States Senate Committee on Banking, Housing, & Urban Affairs on the implementation of the Making Home Affordable Program, also known as HAMP. Ms. Thompson's testimony discussed the prevalence of loan modifications and problems in the loan modification system. See, www.nclc.org/images/pdf/foreclosure_mortgage/mortgage_servicing/testimony_dt_7-16-09.pdf .

In September 2009 Alys Cohen of the National Consumer Law Center submitted substantially similar testimony to the United States House of Representatives Subcommittee on Housing and Community Opportunity of the House Committee on Financial Services regarding HAMP. That written testimony outlined numerous problems with loan modifications under the HAMP, including problems with processing applications and negative consequences on

---

[10] "Washington Attorney General's investigation turns up additional foreclosure problems," April 6, 2011; www.atg.wa.gov/pressrelease.aspx?id=27748

consumers' credit reports.  See, www.house.gov/apps/list/hearing/financialsvcs_dem/cohen_-
_nclc.pdf.

### Potential Areas of Testimony: General Issues, Context

A.   **The Nature and Purpose of Credit Scores**
B.   **The Nature and Purpose of Credit Reports**

### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems.  If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time.  The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others.  The scoring range for the FICO "classic" model is 300-850.  The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[11] are based upon the FICO model.  The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards.  Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[12] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 3.581% | $1,361 |
| 700 - 759 | 3.803% | $1,398 |
| 680 - 699 | 3.980% | $1,429 |
| 660 - 679 | 4.194% | $1,466 |
| 640 - 659 | 4.624% | $1,542 |
| 620 - 639 | 5.170% | $1,642 |

---

[6] In previous years, the Trans Union FICO Score was called "Empirica"
[8] Visited January 9, 2012

16

A similar chart exists for auto loans.  Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels -- even if the cardholder never had a late payment with the company.[13]

1.    The precise workings of the FICO score are highly proprietary and therefore closely guarded.  However, the general parameters are publicly available:[14]

    **35% -- Payment history.**  Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

    **30% -- Credit Utilization.**  The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

    **15% -- Length of Credit History.**  The longer you maintain a positive credit history, the better it is for your credit score.

    **10% -- How Much New Credit?.**  This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?**  The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.    It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.

---

[8] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.

[14] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**Previous credit performance** 



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores.  While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[15]

---

[15] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf

18

**Nature & Purpose Of Credit Reports**

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems. The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports. However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[16]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)     A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

---

[16] *Ibid.*

(3)     If applicable, a section showing **public record** information, like bankruptcies, court judgments and tax liens.

(4)     A section showing **inquiries**, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid her credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 : On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation;

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

practices for handling personal data.   In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.  Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.  (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[17]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[18]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[19]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[20]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[17] http://banking.senate.gov/03_07hrg/071003/index.htm
[18] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[19] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[20] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

24

**Testimony & Expert Reports**

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California , Case No. CV 07-00726-SI. Trial testimony. Expert report, deposition. Judge Susan Illston presiding.

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Laura Jones v. Capital One: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony. Judge Brian F. Kenney presiding, said from the bench:

"Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr. Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony  Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony  Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO. FCRA  Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv–05684-JF. FCRA.  Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D. FTC Section 5. Expert Report. U.S. Magistrate Judge William C. Beaman rejected Defendants' motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia: No. 4:04CV82. FCRA. Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD. FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

26

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Fairness hearing testimony. Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba 1-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony. Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony. Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendants' motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No. 11-18143 (MBK). Expert report. Deposition.

27

First Carolina Banks v. Charles S. McCue, et al.:  In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort.  Civil Action No: 07-CP-07-03027.  Expert report.  Deposition.

Laura M. Jones v. Experian Information Solutions & Capital One Bank; U.S. District Court for the Eastern District of Virginia (1:11-cv-826 CMH/TCB).  Post-bankruptcy credit reporting. Expert report. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.:  U.S. District Court for the Northern District of California [Oakland Div.]  C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD:  U.S. District Court for the Eastern District of Pennsylvania (No 09-699).  Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.:  U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ).  Expert report. Deposition.

Serena Beachley v. PNC Bank N.A..:  U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C.,:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.:  U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).  Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.:  USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx).  Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.:  U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC).  Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.:  U.S. District Court for the District of Oregon; No. 05-CV 0385-BR.  Expert report. Deposition.

James Parker Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina Case No.: 3:09-cv-00609-JFA [Columbia Div.]. FCRA, mixed file. Expert report, deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211.  Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450.  FCRA.  Expert reports. Consolidated deposition.

Jesse Kico v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA. Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

## FEE

My fee is $300 per hour for preparation and for consulting; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

# Evan D. Hendricks

### CURRICULUM VITAE

**Professional Activities**

**1981- Present       Editor/Publisher** of *Privacy Times*

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present       Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present       Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004     Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002       Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks       P.O. Box 302       Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  <u>evan@privacytimes.com</u>**

---

**Recent Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit Hearing, March 24, 2010.[21]

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.[22]

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[23]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[24]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[25]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[26]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[27] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[28]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[29]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[30]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[31]

---

[21] http://www.house.gov/apps/list/hearing/financialsvcs_dem/fihrm_03242010.shtml
[22] http://www.house.gov/apps/list/hearing/financialsvcs_dem/hr072908.shtml
[23] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[24] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[25] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[26] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[27] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[28] http://banking.senate.gov/03_07hrg/071003/index.htm
[29] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[30] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[31] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).
In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Key Privacy Statutes - FCRA and Background Check Problems," Conference on Effective Consumer Privacy Enforcement, Univ. of California-Berkeley Samuelson Law, Technology & Public Policy Clinic. Oct. 13-14, 2011. Berkeley, Calif.

"Annual FCRA Conference," National Association of Consumer Advocates. May 20-21, 2011. Memphis, Tenn.

"91st Annual New York Meeting," Commercial Law League of America (CLLA) November 12, 2010

"2010 NCLC Consumer Rights Litigation Conference," National Consumer Law Center. November 13, 2010.  Boston, Mass.

"26th Annual Consumer Bankruptcy Course," State Bar of Texas. June 3, 2010. Dallas.

"Consumer Protection Law Comm. Representing Main Street: A Consumer Law Primer" Florida Bar Association; June 26, 2009.  Orlando.

34

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[32]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed?  The George Washington University Law School, Washington, DC, June 12-13, 2008.[33]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

---

[32] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[33] http://privacyscholars.com

35

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiffs' Complaint
Plaintiffs' credit reports
Various correspondences by Plaintiff, Defendant and Third Parties
Internal documents produced by Third Parties
Defendant's and Plaintiff's Answers and Responses to Interrogatories

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can Do
(3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 23rd Day of January 2012 in Bethesda, Maryland**

/s/  **Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

36