1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
SANDRA J. BERRIOS,            :
              Plaintiff,      :
                              :
 -vs-                         :          Case No. 1:11-cv-1130
                              :
                              :
EXPERIAN INFORMATION SOLUTIONS,:
INC, et al.,                  :
              Defendants.     :
                              :
------------------------------:
```

HEARING ON MOTIONS

February 17, 2012

Before:  Ivan D. Davis, Mag. Judge

APPEARANCES:

Kristi C. Kelly and Matthew J. Erausquin,
Counsel for the Plaintiff

George E. Kostel, Counsel for Defendant Flagstar

1               NOTE:  The case is called to be heard at 10:52 a.m.

2     as follows:

3               THE CLERK:  Berrios versus Experian Information

4     Solutions, Incorporated, et al., case number 11-cv-1130.

5     Parties please identify yourselves for the record.

6               MR. KOSTEL:  Good morning, Your Honor.  George Kostel

7     on behalf of Flagstar Bank.

8               THE COURT:  Good morning.

9               MS. KELLY:  Good morning, Your Honor.  Kristi Kelly

10    on behalf of Sandra Berrios.

11              As a preliminary matter, we have two individuals we

12    would like to move for admission into this court before Your

13    Honor.

14              MR. ERAUSQUIN:  Good morning, Judge.  Matthew

15    Erausquin for the plaintiff.  I am an attorney licensed to

16    practice before this court.  I would like to introduce Janelle

17    Mason, she is an attorney in my office.

18              THE COURT:  We move admissions at the podium.

19              MR. ERAUSQUIN:  I would like to introduce Janelle

20    Mason, she is an attorney in my office, duly licensed to

21    practice in the Commonwealth of Virginia.  She is of great

22    moral character, I have known her for many years.  We move her

23    admission this morning.

24              THE COURT:  Is there an application?

25              Ms. Mason's application appears to be in order.  The

1    motion will be granted.  Can we provide her the oath of

2    admission.

3              NOTE:  Attorney Mason is sworn.

4              THE COURT:  And who is the second individual?

5              MS. KELLY:  Your Honor, I would like to move Andrew

6    Guzzo into the practice before this Court.  He is an associate

7    of Surovell Isaacs Petersen & Levy, he is a graduate of

8    Washington & Lee University, and he clerked for our law firm

9    prior to joining as an associate this year.

10             THE COURT:  Mr. Guzzo's application likewise appears

11   to be in order.  Motion is grant.  Provide him the oath for

12   admission as well.

13             NOTE:  Attorney Guzzo is sworn.

14             THE COURT:  Ms. Mason and Mr. Guzzo, the Court

15   welcomes you to the Eastern District of Virginia.  I am sure

16   your counsel has informed you or your colleagues have informed

17   you, we're more fondly known as the Rocket Docket.  Look

18   forward to seeing you in the courtroom.

19             MS. MASON:  Thank you.

20             MR. GUZZO:  Thank you, Your Honor.

21             MR. KOSTEL:  Good morning again, Your Honor.  There

22   are two parts to my motion this morning.  One is the location

23   of the Flagstar depositions, and the other is whether subpoenas

24   are required as to the low level employees.

25             I take your admonition very seriously.  I have

4

1    nothing to add to my papers unless you have questions for me.

2              THE COURT:  Well, the Court does have a question.  It

3    appeared based on a reading of the responses to the motions

4    that the plaintiffs were in agreement that these depositions

5    should be taken in Michigan, is that correct?

6              MR. KOSTEL:  That's the way I read it too, Your

7    Honor, and I was just asking for a reissued notice that

8    confirmed that so there wouldn't be any debate down the road

9    when the letters and the e-mail correspondence got mixed in

10   with the notice of deposition.  I didn't want them to be able

11   to argue that we had somehow consented to a notice of

12   deposition in Virginia.  I just don't think it's proper.

13             I am entitled to a proper notice.  I am entitled to

14   be able to respond to it.

15             THE COURT:  All right.

16             MR. KOSTEL:  The same argument with the subpoenas.  I

17   think that is, that is something they do argue, but we can

18   address that after we hear from them.

19             Thank you, Your Honor.

20             MS. KELLY:  Good morning, Your Honor.  I will just

21   briefly address the issue of the location of the depositions.

22             In Mr. Bennett's e-mail in response to Mr. Kostel's

23   letter we said it would be no problem to take them by

24   telephone.  In that same e-mail we asked for dates, since he

25   also objected to the dates of the deposition, so that we could

1    reissue the notice for dates that were more convenient to him

2    so long as they were within a couple weeks.

3            We never received a response to that, so we didn't

4    reissue any notices.  And two days later he filed this motion

5    for a protective order.

6            So, we're happy to work with him on dates and issue

7    appropriate deposition notices once we determine dates that are

8    acceptable.

9            THE COURT:  All right.  Well, that portion of the

10   motion is granted.  Obviously, there is a presumption that

11   those 30(b)(6) motions and things be conducted in the area or

12   in the state or district in which corporate headquarters are

13   located.

14           So, let's move on to the second part of the motion.

15           MR. KOSTEL:  Part two, Your Honor, is the subpoenas

16   as to the low level employees.  Rule 30(b)(1) allows for

17   depositions of officers, directors and managing agents of a

18   corporation.  If an employee is not one of those things, a

19   subpoena is required.

20           The du Pont case issued out of this court recently

21   makes clear that to be a managing agent--  First of all, there

22   is no question they are not officers or directors, we all agree

23   on that.  du Pont makes clear that they have to manage someone.

24           These are customer service representatives.  They

25   don't manage anyone.  They answer the telephone and respond to

1    customer inquiries, that's all they do.  And there has been no

2    evidence to the contrary proffered by the plaintiffs.  So,

3    therefore, we need subpoenas to compel their attendance in

4    Michigan where they reside.

5              Thank you.

6              MS. KELLY:  It's our position that the 30(b)(1)

7    depositions of the ACDV employees are considered managing

8    agents.  An ACDV employee processes the credit dispute which is

9    the subject of this action that Ms. Berrios has filed before

10   the Court.  A dispute comes from the credit reporting agencies.

11   The ACDV operator receives the dispute, investigates based on

12   the corporation's policies and procedures using different

13   documents in their possession, and uses their discretion to

14   make a decision as to whether the dispute is proper, whether to

15   verify the dispute, whether to correct the dispute, or whether

16   to update the dispute, and sends that information back to the

17   CRAs, the credit reporting agencies.

18              And so, for--

19              THE COURT:  They have to exercise their judgment and

20   discretion concerning corporate matters.

21              MS. KELLY:  Right.  And their--

22              THE COURT:  Every employee exercises their discretion

23   and judgment in some form or another.  A janitor exercises his

24   discretion whether or not he is going to mop the floors at 7 or

25   7:30.  That doesn't make, if he is a janitor for a company,

1    doesn't make him a managing agent of that company, does it?

2          MS. KELLY:  No, it doesn't, but these employees are

3    exercising discretion in relation to their employer's policies

4    and procedures regarding the credit disputes.

5          They are also considered party witnesses because the

6    validity of their dispute, the reasonableness of their

7    investigation is the exact issue that's the heart of this

8    litigation.  They are considered party witnesses, and this was

9    addressed in the Wilkes matter before Judge Jones recently, and

10   he considered them party witnesses.

11         They are managing agents.  The factors to consider

12   are whether they invested discretion in the exercise of

13   judgment.  And they clearly do.  They look at the disputes,

14   they refer to database documents in their system, and they use

15   the policies and procedures of their employer to determine

16   whether an investigation should result in changing the

17   information or not.

18         And this is analogous to the Tomingas case that we

19   cited in our brief.  In that case there were two low-level

20   employees who were sent to investigate a crash site.  They went

21   to the site to obtain information about particles that were

22   left after the crash of the airplane.

23         Those employees were determined by the Court to be

24   managing agents even though they weren't an officer or director

25   because they had to determine what was relevant evidence and

1    what wasn't.

2          It is analogous to the ACDV operators because they

3    received the disputes from the credit bureaus.  They are the

4    only individuals that process them.  They don't confer with

5    other employees.  They get the dispute and they determine based

6    on their judgment, knowing their employer's policies and

7    procedures, whether it's relevant or not.

8          And so, we would submit that it's exactly analogous

9    to the Tomingas case.  And under the standards in the du Pont

10   case, they exercise discretion, they are required to carry out

11   their employer's instructions, and their interests are clearly

12   aligned with their employer versus Ms. Berrios.

13         It's doubtful that the defendant would allow us to

14   contact them directly.  And it is even more doubtful that the

15   defendant wouldn't defend their depositions.

16         And for these reasons, we would submit that they're

17   clearly managing agents.

18         Thank you.

19         MR. KOSTEL:  Just 30 seconds, Your Honor.  If that

20   were the standard, then the janitor would be a managing agent

21   if I sued after I slipped on the floor.  The janitor would be

22   using his discretion to mop the floor.  The question of the

23   exercise of that discretion would be to issue, in my slip and

24   fall case, I wouldn't have to subpoena the janitor, he would

25   automatically be a managing agent.

1          So, you would have this resolving scope of managing

2     agent authority depending on what the facts in a particular

3     case were.  That's not the standard.  The standard is it's

4     black and white, you are either a managing agent--

5          THE COURT:  Well, it's never black and white --

6          MR. KOSTEL:  Think about the context of--

7          THE COURT:  Because the Court has to conclude whether

8     or not these individuals have sufficient discretion in

9     exercising their judgment concerning corporate matters.  That's

10    a factual determination the Court has to make in every case.

11         MR. KOSTEL:  Certainly.  But I'm asking you to look

12    at the context of the rule that says, officers, directors and

13    managing agents.  The first two are very readily identifiable.

14         I think the drafters of the rule intended for

15    managing agent to be in that echelon, not to be the echelon of

16    somebody who is answering the phone doing customer service

17    calls.

18         Thank you, Your Honor.

19         THE COURT:  Well, the Eastern District has made it

20    quite clear that there are three factors this Court has to

21    consider.  And I believe the second and third factors basically

22    apply to any employees.

23         So, it's really the first factor that is controlling,

24    whether the corporation has invested that person with

25    sufficient discretion to exercise their judgment concerning

1   corporate matters.

2         Now, the janitor mopping the floor at 7 or 7:30 isn't

3   exercising his judgment concerning a corporate matter because

4   the mopping the floor isn't a corporate matter.

5         This case is somewhat different than that because

6   they are exercising their judgment in regards to making a final

7   determination based on company policies, that something should

8   or should not or is or is not disputed.  The Court has

9   insufficient information in its possession to conclude that

10  these individuals are managing agents.

11        However, what the Court is clear about is that there

12  is sufficient case law that says when there is any doubt, that

13  doubt is to be resolved in the fact, in the determination that

14  they are.  And that's where the Court at this point in time

15  finds that there may be some doubt and, therefore, or that

16  there is some doubt based on their job description and,

17  therefore, will conclude under these circumstances they may be

18  defined as managing agents.

19        Now, you said that those were the only two questions

20  concerning the motion, but I thought the motion also dealt with

21  the fact that the 30(b)(6) notice was overly broad.

22        MR. KOSTEL:  I raised that issue, Your Honor, but if

23  they are prepared to renotice the deposition, I would object at

24  that point if the Court wants to consider it later, but I would

25  be happy to address it now also.

1          THE COURT:  All right.  Well, you seem as if you wish

2   to say something.

3          MR. ERAUSQUIN:  Just real briefly, Judge.

4          The concern that we see from the defendant is the

5   number of topics and the way in which we have described the

6   topics.  And as we have made clear to them, we've outlined

7   these topics with specificity so as to minimize the number of

8   discovery issues we have in the case, the scope of the

9   deposition, and so that they can adequately prepare their

10  30(b)(6) representatives.

11         We have had a meet and confer session with them about

12  these topics, that we believe they are appropriate.  These

13  types of depositions have been compelled.  We do most of our

14  litigation down in the Richmond division.

15         For those reasons, we believe that 30(b)(6) notice as

16  issued is appropriate, Judge.

17         THE COURT:  All right.  Well, the Court would not

18  conclude that a notice of deposition is overly broad simply

19  because of the number of topics sought to be deposed.  It's

20  what those topics are.

21         Having reviewed the topics, the Court does conclude

22  that there are, in fact there is less than 27 because they are

23  repetitive issues or topics, at least in the Court's opinion.

24         However, there are some issues that the Court does

25  not believe are relevant.  So, we can deal with this matter now

1   or, based upon that information, the parties can get together

2   and try to narrow the topics.

3         MR. KOSTEL:  Your Honor, if you have reviewed it, we

4   might as well go ahead and get to the topics themselves.

5         THE COURT:  All right.  Because the Court finds,

6   number 1 not really even relevant.  The history and corporate

7   structure of defendant Flagstar Bank has absolutely nothing to

8   do with whether or not these individuals participated in

9   keeping inaccurate information on the plaintiff's credit

10   report.

11         Flagstar's knowledge and understanding of Fourth

12   Circuit's explanation, completely irrelevant.

13         The method, manner and terms of compensation for each

14   Flagstar employee, the Court doesn't find any relevance.

15         Flagstar's best estimate of the expense and costs of

16   each ACDV investigation, the Court does not find relevant.

17         Your knowledge of the Bach versus First Union FCRA

18   case, the Court does not find relevant.

19         The Court is a little confused in regards to 18, 19,

20   26 and 27, a little--  I don't quite understand what you're

21   asking for, for one.  And because it's unclear as to what

22   you're asking for, the Court finds it difficult to determine

23   whether or not it's relevant or not.  The Court doesn't

24   understand what an e-Oscar scorecard is, for one.

25         MR. ERAUSQUIN:  Can I address all these when you're

1    finished, Your Honor?

2            THE COURT:  Okay.  So, those are the ones that the

3    Court deems that are completely not relevant.

4            Number 2, in regards to previous litigation, well,

5    there can be all types of litigation.  There could be job

6    discrimination complaints and all of the such.

7            So, the Court would find number 2 only relevant as to

8    the litigation involving the claims in this particular

9    complaint.

10           MR. KOSTEL:  And then my other objection to that one,

11   Your Honor, was five years, going back five years.  Would two

12   years be sufficient?

13           MR. ERAUSQUIN:  Judge Payne has actually ruled on

14   this.  He said we should have used three years.  His ruling was

15   three years prior--

16           THE COURT:  I was going to say three.

17           MR. KOSTEL:  No objection.

18           MR. ERAUSQUIN:  Three years prior to the acts

19   complained of is--

20           THE COURT:  Well, would plaintiff's counsel like to

21   address issues 18, or topics 18, 19, 26 and 27?

22           MR. ERAUSQUIN:  Well, we would like to start with 5,

23   Judge.  5 goes to the issue of willfulness.  That is, whether

24   or not Flagstar's interpretation of the requirements of the

25   Fair Credit Reporting Act pursuant to the Supreme Court's

1   decision in <u>Safeco</u> and how it obtained that understanding--

2          THE COURT:  What willfulness goes to is whether or

3   not a trier of fact has determined whether or not Flagstar's

4   employees' conduct amounts to willfulness, meets the definition

5   of willfulness.

6          Their understanding of what that definition is is

7   completely irrelevant.  It's the trier of fact--  The judge is

8   going to instruct the jury of what the definition of

9   willfulness means.  Then the trier of fact has to determine

10  whether or not the defendants' conduct meets said definition.

11  That's the only thing that is relevant concerning willfulness.

12         MR. ERAUSQUIN:  Well, in the Supreme Court's decision

13  in <u>Safeco</u> the issue was whether or not the individual who is

14  alleged to have violated the Fair Credit Reporting Act had an

15  interpretation of the statute that was reasonable.

16         And so, our position would be that with respect to--

17  If Flagstar Bank would say, for example, we never read the

18  Fourth Circuit's decision in the <u>Johnson</u> case--  Which, by

19  about the way, Judge, is the seminal case not just in our

20  circuit but across the country, we would argue that that went

21  to whether or not their interpretation of the statute was

22  reasonable if they never read the case law surrounding it as it

23  applies at least in our circuit.

24         THE COURT:  But an interpretation of an entire

25  statute is one thing.  Whether or not the parties' conduct

1    amounts to willful or reckless behavior is another.

2           MR. ERAUSQUIN:  Yes, sir.  But the conduct is driven

3    by the company's policies and procedures, which are created by

4    lawyers who are reading the statute and reading the case law

5    surrounding the statute.

6           THE COURT:  But these employees when they conducted

7    themselves--  There is no information in this Court's

8    possession that when these employees conducted themselves in

9    this manner, that they had been previously advised by their

10   lawyers of what willfulness means.

11          MR. ERAUSQUIN:  Yes, sir.  If that becomes an issue,

12   we can revisit that, I guess, Judge.

13          I was trying to follow the numbers in which you had

14   expressed some concern with the relevance of the topics, and I

15   missed the next few of them.  After 5, Your Honor--

16          THE COURT:  That the Court found not relevant?

17          MR. ERAUSQUIN:  That the Court found, right, not

18   relevant.

19          THE COURT:  13, 16, and 25.

20          MR. ERAUSQUIN:  With regard to actually both 13 and

21   16, this I think falls into the category of two that have

22   significant overlap.  The issue is whether or not Flagstar

23   apportioned the proper resources to its employees to determine

24   whether or not the consumer's dispute had any validity.  The

25   issue generally, and we've--

1           THE COURT:  They paid them.

2           MR. ERAUSQUIN:  Correct, Judge, but the issue is how

3    they paid them.

4           THE COURT:  How much they get paid is irrelevant.

5    Your argument would be then that people who get paid less

6    money, do a poor job; and people who get paid a lot of money,

7    do a wonderful job.  Based on the Court's experience, we know

8    that's not the case.

9           MR. ERAUSQUIN:  Right.  We are not exactly there,

10   Judge.  The way that banks, at least most banks, this is our

11   first litigation with Flagstar, set up the process by which

12   ACDV employees get paid is they get paid on quality and they

13   get paid on production.  Quality relates to how closely they

14   follow the procedures of the company.  Production relates to

15   how many of these disputes they process.

16          If they process more disputes, they get paid more

17   money, which means that inherently they spend less time per

18   dispute.  That's what we were getting to with the way that they

19   incentivize their employees to process a greater amount of

20   disputes per day.  If they are flying through these and

21   spending five seconds and saying, verify, verify, verify,

22   without conducting an investigation, that's relevant, Judge.

23          THE COURT:  But then the issue is whether or not they

24   conducted a reasonable investigation.

25          MR. ERAUSQUIN:  Correct.

1          THE COURT:  Not how much time it took to conduct said

2     investigation.

3          MR. ERAUSQUIN:  Well, it--

4          THE COURT:  Simply because an investigation may take

5     an hour by some ACDV employee and the same investigation may

6     take 30 minutes by another ACDV employee, doesn't mean that the

7     employee who took 30 minutes did a bad job, a worse job than

8     the one who took an hour.  Some employees are better than other

9     employees.

10          Just like lawyers, some lawyers take a lot longer to

11     accomplish the exact same task than other lawyers do.  That's

12     why they get paid differently.

13          The Court does not find that information to be

14     relevant.

15          MR. ERAUSQUIN:  25 actually would fall into the same

16     category as 5, but with, with even more poignance, Judge,

17     because this was a decision that related to this particular

18     defendant.

19          In other words, there was a Fair Credit Reporting Act

20     decision by which one of the predecessor companies of this

21     defendant was told that its procedures did not comply with the

22     Fair Credit Reporting Act.  The jury awarded, I believe it was

23     4 or $600,000.  That prior litigation knowledge, that prior

24     warning would be, would serve as notice to the defendant that

25     it needed to take another look at the procedures that its

1   employees were using to investigate these disputes.

2              THE COURT:  I thought you said it was the predecessor

3   of this bank?

4              MR. ERAUSQUIN:  Correct.

5              THE COURT:  Not this bank.

6              MR. ERAUSQUIN:  Correct.  It was the First Union

7   entity that was the subject of the prior litigation.  As I

8   understand it from the depositions that were taken in this

9   case, this entity took over First Union.  Therefore, it

10  subsumed that company that was the previous defendant in the

11  earlier litigation.

12             THE COURT:  And were the claims in that litigation

13  substantially identical to the claims in this litigation?  And

14  were the allegations about whether or not the defendant

15  properly filed or properly followed certain procedures

16  essentially and substantially identical as the allegations

17  contained in this complaint?

18             MR. ERAUSQUIN:  The only section of the Fair Credit

19  Reporting--  The answer is yes.  The only section of the Fair

20  Credit Reporting Act that you can sue on based on a furnisher's

21  conduction of an investigation is Section 1681s-2(b).  That was

22  the issue, that was the claim at issue in Bach, and that's the

23  claim at issue in this case, Judge.

24             THE COURT:  No.  What I am trying to get to is the,

25  was the factual scenario substantially identical to the one in

1  this case?

2        MR. ERAUSQUIN:  In Bach I believe it was an

3  individual who was the subject of identity theft, that was an

4  account that was not hers.  We had a similar issue in this case

5  with regard to the accuracy of the credit recording.

6        THE COURT:  But it dealt with the accuracy of the

7  credit report and the procedures followed to determine whether

8  or not that information was accurate?

9        MR. ERAUSQUIN:  Yes, sir.

10        THE COURT:  The Court will find 25 relevant.

11        MR. ERAUSQUIN:  With regard to 26, this goes to

12  willfulness.  In other words, we're trying to get Flagstar to

13  take a position as to whether or not the actions that its

14  employees taken, took in this case were the result of a

15  mistake, or did they intend for the employees to take the

16  actions that they took.

17        If they want to concede, essentially, negligence and

18  say, our employees dropped the ball here, we want to know that

19  up front so that we can structure our jury argument

20  accordingly.  We are just asking them to take a position as to

21  what happened in this case, Judge.

22        THE COURT:  That clarifies what that means.  The

23  Court will find that relevant.

24        MR. ERAUSQUIN:  And, actually, that's explicitly what

25  27 is saying as well.

1        THE COURT:  It would be the same for 27.  What about

2   18 and 19?

3        MR. ERAUSQUIN:  All right.  With regard to 18, the

4   Fourth Circuit, they had a decision in <u>Saunders</u>, it was about

5   two years ago, that related to whether a furnisher's

6   investigation of a consumer dispute could be categorized as

7   reasonable, relates to whether or not that information was

8   accurate and complete.

9        In other words, when the furnisher responds back to

10   the credit reporting agency--

11        THE COURT:  The case isn't going to assist me in

12   determining relevance without telling me what 18 means.

13        MR. ERAUSQUIN:  Yes, sir.

14        THE COURT:  That would be the Court's problem.

15        MR. ERAUSQUIN:  I am almost there, Judge.  I am

16   almost there.  One of the components as to whether or not that

17   information is complete is whether or not that information is

18   the subject of an ongoing dispute by the consumer.

19        Code XB in number 18 means in the credit reporting

20   world, this account is the subject of a dispute.  CCC means

21   compliance condition code.

22        So, we're asking whether or not Flagstar understood

23   that when it reported that the trade line was the subject of an

24   ongoing dispute, that it would no longer be included as part of

25   that consumer's credit score.

1          THE COURT:  That's probably the way you should have

2    phrased the question or the topic.

3          MR. ERAUSQUIN:  Yes, sir.

4          THE COURT:  The Court will find that relevant.

5          What about number 19?

6          MR. ERAUSQUIN:  The e-Oscar scorecard, this is a

7    month-by-month report as to how the defendant has responded to

8    credit reporting disputes that have come in through the credit

9    reporting agencies.

10          The evidence we're going to seek is in how many

11    instances where disputes came in you did you just say, verified

12    as reported.  Or in how many instances did you say that we need

13    to modify the information or that the account should be

14    deleted, for example, due to fraud.

15          And so, we're asking as to the defendants' knowledge

16    as to how it has responded to e-Oscar disputes each month.

17          THE COURT:  You mean prior to an investigation?

18          MR. ERAUSQUIN:  Correct.  I don't have the timing of

19    every single ACDV that we have in this case, but we have

20    limited it to the period beginning January 1, 2010, to the

21    present.

22          We would accept a stipulation that it would be the

23    period that began the month before the ACDVs in this case were

24    processed.  The ACDVs are the disputes that come from the

25    credit reporting agencies.

1          THE COURT:  No, that really wasn't the Court's

2    question.  What the Court is trying to determine is, if

3    something was verified as reported, and it was determined later

4    on that that was an accurate verification, that doesn't appear

5    to help your case at all.  It only appears that if they say

6    verified as reported and later on there was a determination

7    that that determination was inaccurate, would that be helpful.

8          MR. ERAUSQUIN:  Correct.  And to the extent that the

9    jury finds that the information reported was inaccurate and,

10   for example, that this defendant says verified as reported for

11   99 percent of the disputes that come in, we want to argue it's

12   quicker to click that verified as reported button than it is to

13   actually go back behind the scenes and do an investigation to

14   find out if the information was accurate or not.

15         THE COURT:  But if they click the button and it was

16   the right click, then they did nothing wrong.

17         MR. ERAUSQUIN:  Correct.  But if the jury, if we get

18   to that point, we're not going to know when we're at trial

19   whether or not the jury is going to rule that way.  We want to

20   have the evidence in hand to argue for willfulness.

21         So, the jury is going to have to determine both there

22   was a violation and it was willful.

23         THE COURT:  Is there a procedure by which the bank

24   verifies something and then later on that determination is

25   determined to be accurate or not accurate?

1        MR. ERAUSQUIN:  The bank as part of its determination

2   to whether to verify it has to determine whether or not it's

3   accurate or not accurate.  It has to do the quote/unquote

4   reasonable investigation that Johnson requires.

5        THE COURT:  I mean subsequent to making the statement

6   verified as reported.

7        MR. ERAUSQUIN:  That's it, that's the--  I'm sorry.

8        THE COURT:  Is there any quality assurance that they

9   say later on that say, well, you verified those hundred as

10  accurate, and based on our audit or quality assurance process,

11  we've determined that 60 of those verified as accurate were

12  wrong?

13       MR. ERAUSQUIN:  Correct.  That may be part of its

14  internal audit procedures, but from the consumer standpoint as

15  soon as that verified as reported button is clicked, that

16  information is staying in your credit report.  There is no,

17  we're going to come back 30 days after the fact and revisit it.

18  That's the end of the investigation as far as the consumer is

19  concerned.

20       THE COURT:  I understand that.  But there are certain

21  elements, four elements that you have to prove to prove that

22  they violated the FCRA.  The fact that they click on a button

23  isn't one of those.  The fact that they click on the button and

24  that was the wrong click and they didn't do a reasonable

25  investigation to determine prior to clicking on the button that

1   it would be the right click, that would be relevant

2   information.

3           MR. ERAUSQUIN:  Yes, sir.

4           THE COURT:  The fact that they clicked the button

5   doesn't help anyone.

6           MR. ERAUSQUIN:  Yes, sir.  But this goes to the

7   previous topic we were talking about, the amount of disputes

8   that they process in a day.  Our depositions that we have taken

9   in other cases, for example, these employees will take

10  20 seconds per dispute and just go through and just say, the

11  information on this screen matches the information on this

12  screen, I am going to click verified as reported, and they fly

13  through them.

14          The reason that we're asking for this information is

15  so we can argue to the jury, in a given month you processed

16  50,000 of these disputes, and in every single one of them you

17  just clicked the verified as reported button.  You are not

18  doing a reasonable investigation.  In fact, you're not doing

19  any investigation, you're just clicking a button.

20          THE COURT:  All right.  Well, I'm sure their response

21  will be, no, we conducted an investigation before we clicked

22  the button, but if that's your argument--  Mr. Kostel.

23          MR. KOSTEL:  Yes, Your Honor, real quick on that last

24  one, start with the last one.

25          They are already taking the depositions of the

1   operators.  These might be appropriate topics for the

2   operators.  If they need to take a corporate deposition on

3   that, we can revisit it if they don't get the information they

4   want from the operators.

5          THE COURT:  That appears to be reasonable.

6          MR. KOSTEL:  And, Your Honor, at the risk of

7   backtracking a little bit here, I just want to address two

8   subjects that you just ruled on, number 25, the Bach v. First

9   Union FCRA case.  My concern there is our answer may be, we got

10  information from our lawyer.  Well, what's the information you

11  got from your lawyer?  I don't want to set this up for some

12  kind of privilege argument when our in-house counsel tell them

13  about the case.

14         THE COURT:  Well, they can't get information from

15  what the lawyer says.

16         MR. KOSTEL:  But I need to educate them on this

17  subject, which is framed in terms of legal advice from counsel.

18  What did your counsel tell you about the Bach v. First Union

19  case.  That's my concern with the topics that say, tell us

20  about this case.

21         They have already covered all of our policies, all of

22  our manuals.  The question should be, under your--  We

23  designate a deponent on the policy--

24         THE COURT:  Well, let's make this simple--

25         MR. KOSTEL:  Did your policy change as a result of

1    the Bach v. First Union case, that would be a very simple

2    question.

3                THE COURT:  Counsel, let's make this simple.  We will

4    change 25 to your personal knowledge.  Then we will avoid the

5    attorney/client privilege problem.  If they don't have any

6    personal knowledge, then that will be the answer to the

7    question.

8                MR. KOSTEL:  That's fine, as long as I don't have to

9    educate them, which I would have to do ordinarily under a

10   30(b)(6) topic.

11               THE COURT:  But that's not--

12               MR. KOSTEL:  Usually lack of knowledge--

13               THE COURT:  Usually that wouldn't be personal

14   knowledge.  What you educate them on is not their personal

15   knowledge.

16               MR. KOSTEL:  Understood, understood.  And then, Your

17   Honor, number 17.  I mean, it's so overbroad.  I think it needs

18   some attention because it also duplicates number 14.

19               Everything that was done regarding the plaintiff's

20   disputes made pursuant to the FCRA, including all dates of

21   communications or actions, all documents considered, all

22   persons involved, the location of all such actions, all steps

23   taken, you get the idea.  We're already talking about every

24   dealing we had with the plaintiff in number 14.  I didn't

25   object to that.

1         But this notion that one person or, you know, we have

2    got to get all knowledge from the bank on all subjects and all

3    locations and all times, that's onerous, to prepare a deponent

4    on all those things, when it is already subsumed in number 14.

5         Thank you.

6         MR. ERAUSQUIN:  As to the privilege issue, Judge, we

7    are, of course, not intending to convey privilege, but they

8    can't have it both ways.  They can't defend the willfulness

9    claim by saying, well, we investigated these based on

10   procedures and advice that we got from lawyers, but we're not

11   going to tell you what that advice was or why we chose these

12   policies to put in place.

13        THE COURT:  You cannot get around the attorney/client

14   privilege.

15        MR. ERAUSQUIN:  Yes, sir.  Yes, sir.

16        THE COURT:  It's a recognized privilege in the

17   federal system.

18        MR. ERAUSQUIN:  Absolutely.  And that's why we rely

19   heavily on the use of Rule 37(c)(1).  They are not going to be

20   permitted to use at trial information that they don't give us

21   during discovery.

22        So, this actually ties back to 17, which he was just

23   discussing.  This goes directly to what was done with regard to

24   these investigations.  If they don't want to tell us about it,

25   that's in my fine, but we're going to move later to preclude

1    the use of that evidence in their defense.

2           THE COURT:  You have an absolute right to use the

3    Federal Rules of Civil Procedure as the way you interpret them.

4           MR. ERAUSQUIN:  Yes, sir.  But I just want to be

5    clear so we don't get into a discovery dispute and have to call

6    chambers, 17 relates directly to what was done with regard to

7    investigating these disputes for these consumers.  It says,

8    everything--

9           THE COURT:  I think his problem is you say all.

10          MR. ERAUSQUIN:  Yes, sir.  We want to know--

11          THE COURT:  Like if someone, like if a mail carrier

12   put the, took the dispute information, someone put it in an

13   envelope and he went to the mail box and dropped it off, that

14   would be, that would be part of 17.

15          MR. ERAUSQUIN:  Yes, sir.

16          THE COURT:  Well, that is a little overbroad.  Every

17   little thing that happened in regards to this dispute is not

18   really relevant.  Whether or not, whether or not a mailman

19   picked up a dispute in an envelope out of a mail box, it's not

20   relevant.

21          MR. ERAUSQUIN:  Correct.  I think we are kind of

22   tilting at windmills here, Judge.  If they don't want to tell

23   us about the mailman, we're not going to push it, but they

24   can't use that at trial, is the point.

25          THE COURT:  We understand that.

29

1          MR. ERAUSQUIN:  Yes, sir.  Okay.

2          THE COURT:  I am sure counsel completely understands

3     the Federal Rules of Civil Procedure.

4          MR. ERAUSQUIN:  Yes, sir.  Thank you, Judge.

5          MR. KOSTEL:  Thank you very much, Your Honor.  That's

6     all we have.

7          Should we review the topics that you are eliminating

8     one more time for the record?

9          THE COURT:  All right.  That was topic 1.  Of course,

10    we modified topic 2.  I believe topic 5.  Topic 13.

11         MR. KOSTEL:  16, Your Honor.

12         THE COURT:  16.  I believe that was it.

13         MR. KOSTEL:  And 17 as limited, or as discussed, I

14    guess.

15         THE COURT:  Correct.

16         MR. KOSTEL:  Thank you, Your Honor.

17         THE COURT:  All right.  Now, the plaintiff's motion

18    for leave to supplement their amended complaint.

19         MS. KELLY:  We don't have a motion--

20         MR. KOSTEL:  I think we just save some time, Your

21    Honor.

22         THE COURT:  Oh.  No, that's in the wrong file.  Thank

23    you.

24         MR. KELLY:  Okay.

25         THE COURT:  That concludes this matter, correct?

30

1            MR. KOSTEL:  Correct, Your Honor.

2            MS. KELLY:  Thank you, Judge.

3            MR. KOSTEL:  Thank you.

4            MR. ERAUSQUIN:  Thank you.  Have a good day, Your

5      Honor.

6            ------------------------------------------------

7

8            C E R T I F I C A T E  of  T R A N S C R I P T I O N

9

10           I hereby certify that the foregoing is a true and

11     accurate transcript that was typed by me from the recording

12     provided by the court.  Any errors or omissions are due to the

13     inability of the undersigned to hear or understand said

14     recording.

15

16           Further, that I am neither counsel for, related to,

17     nor employed by any of the parties to the above-styled action,

18     and that I am not financially or otherwise interested in the

19     outcome of the above-styled action.

20

21

22

23                         ___/s/ Norman B. Linnell___

24                         Norman B. Linnell

25                         Court Reporter - USDC/EDVA